**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **DAVID EARLY GROUP, INC., et al.,** | |
| **Plaintiffs,** | **MEMORANDUM DECISION AND ORDER** |
| **vs.** | |
| **BFS RETAIL & COMMERCIAL OPERATIONS, LLC,** | Case No. 2:06CV277DAK |
| **Defendant.** | |

This matter is before the court on (1) Plaintiffs David Early Group, Inc., Early Holdings LLC, David W. Early, David D. Early, and Portia A. Early's ("the Early Parties") motion for summary judgment on all claims and counterclaims and (2) Defendant BFS Retail & Commercial Operations, LLC's ("BFS") partial motion for summary judgment. The court held a hearing on these motions on November 28, 2007. At the hearing, Plaintiffs were represented by Greggory J. Savage and Defendant was represented by John P. Harrington. The court took the motions under advisement. The court has carefully considered all pleadings, memoranda, and other materials submitted by the parties, the arguments made by counsel at the hearing, and the law and facts relevant to the motions. Now being fully advised, the court enters the following Memorandum Decision and Order.

1

## BACKGROUND

The Early Parties brought this lawsuit against BFS for declaratory judgment and breach of contract in connection with the sale of David Early Tire stores to BFS in 2004.  BFS then brought counterclaims associated with repayment for certain repairs made to the retail locations after they took control of the stores.

David Early Sr. opened his first store in 1973 and, over the following years, he proceeded to open seventeen fully-owned properties and one leased store.  In 1995, Early incorporated David Early Group, Inc. to serve as the operating entity for the David Early Tires retail chain. The real property on which the retail stores are located, however, was owned by Early Holdings LLC.  Along with their father, Early's son and daughter, who are also Plaintiffs in this action, are shareholders of David Early Group, Inc. and Early Holdings LLC.

The David Early stores sold a large quantity of Bridgestone/Firestone tires.  In 1999, Early was approached by a large tire company to purchase the David Early stores.  In response, Bridgestone/Firestone representatives approached Early and proposed that the parties enter a "put-call option agreement."  After a period of negotiations, Bridgestone/Firestone Inc. and the Early Parties executed such an agreement.  The agreement gave the Early Parties the option to trigger an asset sale transaction under which Bridgestone/Firestone would essentially purchase the assets of the David Early Group Inc. and lease the real property underlying those stores from Early Holdings LLC.

Due to a prolonged decrease in sales from 2000 to 2003, the David Early stores were kept afloat through a revolving line of credit obtained from Bridgestone/Firestone.  In November 2003, Early decided to trigger the "put" option, thus requiring Bridgestone/Firestone to purchase

the assets of the business and take over the operation of the retail stores.

Shortly after the Early Parties triggered the put option, the parties entered into negotiations to create written agreements for the transaction.  By that time, the operative Bridgestone/Firestone entity involved in the deal was BFS.  During the negotiation phase, BFS personnel conducted on-site inspections of all the David Early retail locations.  BFS claims that David Early allowed only cursory walk-through inspections of the stores because they did not want employees to find out about the acquisition.  Nonetheless, as a result of these walk-through inspections, BFS became concerned about the physical condition of several of the locations, particularly with respect to roofs and parking lots.

These and other concerns resulted in a two-day meeting in May of 2004, during which the parties negotiated several matters.  The parties addressed an amount that the Early Parties would pay for certain repairs and improvements.  BFS states that it told the negotiator for David Early at the meeting that the amount was not enough to cover the ADA required repairs or other repairs that had not been discovered during the limited walk-through inspections.

At the end of their negotiations, on July 1, 2004, the Early Parties and BFS executed a series of detailed written agreements to memorialize the transaction.  One of these agreements was an Asset Purchase Agreement ("APA").  The APA essentially provided for and governed the sale to BFS of all assets associated with the David Early stores, excluding the real property owned by Early Holdings.  Sections 10.1 and 10.2 of the APA also expressly state that it is an integrated agreement.

In conjunction with the APA, the parties also executed a series of Lease Agreements, whereby Early Holdings, as landlord, leased to BFS, as tenant, the real property associated with

3

the former David Early stores.  The parties executed separate, but virtually identical, Lease Agreements for each of the retail locations.

Also in connection with the transaction, David Early Sr., David Early Jr., and Portia Early, each entered into ten-year non-compete agreements with BFS.  As consideration for the covenants not-to-compete, BFS agreed to make annual installment payments of $250,000 for the ten-year non-competition period.

With respect to the issues relating to the physical condition of the David Early facilities, the APA included a provision requiring that $300,000 for repairs on the roofs, parking lots, buildings, and other premises at the former David Early locations be offset against the purchase price and, therefore, paid by the Early Parties.  In addition, BFS held back another $100,000 of the purchase price as a reserve for future indemnification claims that BFS might make pursuant to other provisions of the APA .  These two amounts were subsequently changed through a written and fully-executed amendment to be $283,676 for the repair offset and $211,570 for an indemnification reserve.

The $283,676 offset under Section 3.2 was non-refundable.  But Section 3.4, as amended, provides that on the second anniversary of the July 1, 2004 Closing Date, the Early Parties were entitled to be repaid any portion of the indemnification reserve that had not been applied to legitimate claims for indemnification by BFS.

The Early Parties acknowledge that they could be required to pay any amounts that fell within one of the other express provisions of the APA, such as Sections 8.8 or 9.2.  Section 8.8 covers certain improvements required by governmental authorities, and Section 9.2 requires indemnification for items such as environmental/hazardous material conditions.

4

The entity known as the David Early Group Inc. operated the David Early stores up through the execution of the APA.  BFS took over the David Early Tire stores on July 1, 2004. All of the stores were fully operating when BFS took over the stores.  But BFS claims that there were serious problems at some of the locations.  For example, the Heber store was subsequently condemned.

After taking control of the stores, BFS upgraded the stores with a new look in order to make them visually consistent with the BFS brand.   BFS's Vice President of Real Estate testified that BFS knew that once they started the process, they would need to get permits and that obtaining permits would then necessarily set up the inspection process.  BFS admits that it never sent any prior notice to the Early Parties specifically identifying the work it proposed to do on the stores and whether that work would be BFS's or the Early Parties' responsibility to pay.

On October 25, 2005, BFS sent the Early Parties a demand for $1,026,498 in costs and expenses incurred by BFS in making various repairs and improvements to the David Early retail locations.  This amount is a portion of over $5,000,000 that BFS spent on the work done to the stores.  A large portion of the $5,000,000 was spent on remodeling the stores, which BFS did not attempt to pass on to the Early Parties.  Included with the October 25 demand letter was a spreadsheet entitled "SLC Chargeback Breakdown."  This spreadsheet broke down the total repairs and associated costs into the following categories:

> ADA Required Repairs $147,940;
> Environmental Requirements $84,197;
> Code Costs $542,830;
> Permits $4,098;
> Engineering Costs $16,586; and
> Structural/Utilities/Roofs/Overhead Door $230,847.

With the exception of the environmental requirements category, BFS claims that it is entitled to reimbursement under Section 8.8 of the APA, the oral agreements it reached with the Early Parties for reimbursement, and the course of conduct and dealings between the parties after the APA was executed.  The Early Parties do not contest that BFS was entitled to offset the environmental related costs against the Indemnification Reserve.  But they dispute the other requests for indemnification.  Thus, the Early Parties contend that the balance in the Indemnification Reserve need only be reduced to $126,803.

The Early Parties refused to pay the remaining categories of costs because they claim that they never received notice as was required under the APA.  They claim that BFS did not and cannot show that the repairs were required by a governmental authority in order for BFS to obtain the necessary business license and other permits required by law for BFS to commence business operations as it had been operated by the Early Parties prior to the closing of the APA.

BFS contends that it informed the Early Parties before the APA was signed about ADA violations at the David Early stores.  As part of that discussion, BFS states that it gave the Early Parties a copy of the ADA consent decree to which BFS is a party.  The consent decree outlines the standards that BFS must follow in order to be compliant with the ADA.  BFS told the Early Parties that the stores were not in compliance with the ADA consent decree.  The parties could not agree on how much it would cost to rectify the ADA violations and, therefore, the parties set aside the issue of ADA repair costs.

BFS also claims that the two principal negotiators of the APA reached an oral agreement regarding how repairs would be handled.  These negotiators, Hoffman and Capretta, allegedly agreed that Capretta would communicate with Hoffman regarding the work that was being done,

6

including generally how much it was costing, and as long as the costs were "ordinary and customary," BFS would proceed with the repairs and then square up who paid what later. BFS states that Capretta kept Hoffman informed that BFS was repairing the stores, that the stores were in poor condition, and that the repairs were costing a lot of money and taking a lot of time.

The parties agree that the Early Parties never objected to the work that was being done. But they disagree as to why they did not object. The Early Parties assert that the APA capped their expenses with respect to reimbursement costs and if they owed any additional amounts, they would be notified prior to the work being done. On the other hand, BFS claims that the Early Parties did not object because the parties were operating under their alleged oral agreement.

There is also a dispute as to the level of knowledge the Early Parties had with respect to the work that was being done. David Early was aware of work being done on some of the stores because he was called to the site. He met with someone from Ron Case Roofing on approximately three occasions. Despite their knowledge that work was occurring at the sites, however, the Early Parties assert that they did not believe it was work that would require indemnification in addition to the amounts agreed upon in the APA.

On January 20, 2006, BFS provided notice to the Early Parties that it intended to withhold payments due to the Early Parties under the leases and non-compete agreements until it had been reimbursed for the charges. During this time, the parties continued to negotiate an amendment to the APA which was eventually signed in January or February 2006, a few weeks before the Early Parties filed this lawsuit.

On March 3, 2006, the Early Parties filed their original Complaint in this case, which was then amended. The Amended Complaint contains eight claims for relief seeking declaratory

7

judgments that (1) BFS is not entitled to be reimbursed for the repairs set forth in its October 25, 2005 demand letter; (2) BFS's failure to follow the procedures set forth in Section 8.8 of the APA constitutes a breach of the agreement or the failure of a condition precedent to asserting claims for reimbursement from the Early Parties; (3) the repairs and improvements made by BFS were not reasonable and necessary and do not meet the criteria to be deemed reimbursable expenses; (4) BFS's notice in January 20, 2006, that it would withhold payments due to the Early Parties constitutes an anticipatory breach of the APA, Lease Agreements, and Non-Compete Agreements; (5) the Early Parties are entitled to all payments due or accruing under the parties' agreements; (6) BFS's actions constitute default under the Lease Agreement; (7) the Early Parties are entitled to their contractual remedies for BFS's default; and (8) BFS waived all right to reimbursement when it failed to provide the Early Parties with adequate prior notice of the repairs and improvements, failed to follow the procedures set forth in the APA, and unilaterally undertook to make the repairs and improvements.  The Amended Complaint also contains another claim for breach of contract based on BFS's failure to make full payments pursuant to the Lease Agreements and Non-Compete Agreements and failure to pay the Indemnification Reserve payment on July 1, 2006 as required by the APA.

BFS counterclaimed against the Early Parties, asserting the following five claims:  (1) breach of the covenant of good faith and fair dealing; (2) unjust enrichment; (3) promissory estoppel; (4) declaratory judgment that the Early Parties have waived their right to object to the repairs and environmental cleanup performed by BFS by not objecting to the work when it was occurring; and (5) negligent misrepresentation.

BFS has continued to withhold payments under the lease agreements and non-compete

agreements during the litigation of the case.  As of the date of these motions, the Early Parties

claim that BFS owes them $845,518.

## DISCUSSION

The Early Parties move for summary judgment on all claims and counterclaims.  BFS

moves for partial summary judgment claiming that it is entitled to judgment as a matter of law on

the Early Parties' first, fourth, fifth, sixth, seventh, eighth, and ninth causes of action and BFS's

second, third, and fourth claims as they relate to the environmental repairs at all locations, the

ADA repairs at all locations, and any other work completed at the Bountiful, Sandy, and North

Temple locations.  In addition, BFS moves for summary judgment on the Early Parties' third

claim for relief on the grounds that the Early Parties have produced no evidence to support their

allegations that BFS' repairs were unreasonable.

## A.  Early Parties' Claims

The Early Parties contend that the APA governs any dispute between the parties in

connection with the sale and repairs of the David Early stores.  The Early Parties assert that they

have already paid the agreed and required amount for repairs and improvements not otherwise

falling within the express scope of the APA.  BFS, however, argues that the evidence, viewed in

the light most favorable to BFS, demonstrates that the APA is not a fully integrated agreement.

BFS contends that the APA was amended by (1) oral and written agreements between the parties

beginning immediately after the APA was executed in July 2004 and (2) the parties' course of

conduct and dealings thereafter.

The APA contains a integration clause that provides as follows: "This Agreement and the

other agreements expressly provided for herein set forth the entire understanding of the parties

hereto with respect to the subject matter hereof and supersede all prior contracts, agreements, arrangements, communications, discussions, representations and warranties, whether oral or written, between the parties." APA § 10.2.  The APA further provides that it "may be amended only by a writing executed by all of the parties." *Id.* § 10.1.

Where the parties' transaction is governed by a fully-integrated written contract, Utah courts reject alleged duties and agreements outside the four corners of that written contract. *See Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶19, 52 P.3d 1179.   BFS, however, asserts that the APA is not a fully integrated agreement because of the Early Parties' actions, comments, and supplemental oral agreements.

The issue of whether or not a contract is integrated is a question of fact which is determined using all relevant evidence. *Becker v. HAS/Wexford Bancgroup, LLC*, 157 F. Supp. 2d 1243, 1251 (D. Utah 2001).  Utah courts "apply a rebuttable presumption that a writing which on its face appears to be an integrated agreement is what it appears to be." *MediaNews Group, Inc. v. McCarthey*, 432 F. Supp. 2d 1213, 1225 (D. Utah 2006).  In other words, "a declaration in the contract that it is integrated is not conclusive, [it] is only a factor to be considered." Restatement (Second) of Contracts § 209, cmt. b (1981).

BFS claims that there is evidence of at least two oral agreements that rebut the presumption that the APA is a fully integrated agreement.  First, BFS claims that the parties entered into an oral agreement prior to the execution of the APA with respect to ADA compliance.  BFS asserts that the parties did not negotiate or agree upon changes needed for ADA compliance because of BFS's inability to conduct full and complete inspections of the stores before it took over and the parties' inability to agree on how much ADA repairs would

cost.  As a result, BFS claims that the parties decided that they would "deal with it later."

BFS also contends that the parties entered into an oral agreement with respect to other repairs, known and unknown.  To deal with these repairs, the principal negotiators, Capretta and Hoffman, allegedly agreed that Capretta would keep Hoffman informed as to the work that was being done, how much it was costing, and as long as it was "ordinary and customary, " BFS would proceed with the work and the parties would "square up" as to who owed what after the work was completed.

"'[I]n most instances, where a binding agreement exists, whether completely or partially integrated, evidence of prior or contemporaneous agreements or discussions is not admissible to contradict terms of the written agreement." *Novell Inc.  v. Canopy Group, Inc.*, 92 P.3d 768, 773, 2004 UT App 162 ¶ 15 (citation omitted).  "'[P]arol evidence not inconsistent with the writing is admissible to show what the entire contract really was, by supplementing, as distinguished from contradicting, the writing.  In such a case parol evidence to prove the part not reduced to writing is admissible, although it is not admissible as to the part reduced to writing.'" *Id.* (citation omitted).

In this case, the parties addressed the right to offsets with respect to repairs and payments associated with any improvements or repairs required by a governmental entity.  In Section 3.2 of the APA, as amended, the parties agreed that the Early Parties would pay a sum to be set aside for repairs and other improvements.  Section 3.2 of the APA states:

> Without limiting or otherwise adversely affecting in any way whatsoever Buyer's rights under other provisions of this Agreement, including but not limited to Buyer's reimbursement rights under Section 8.8, Buyer's indemnification rights under Section 9.2 and Buyer's offset rights under Section 9.5, $283,676 shall be offset against the Purchase Price for repairs to buildings,

parking lots and other improvements located on the Premises (including but not limited to the repairs set forth on Schedule 3.2, which are required to be made by Buyer but excluding any and all alterations, improvements, and repairs that any Governmental Authority may require Buyer to make to the Premises in order for Buyer to obtain any and all business licenses and other Permits required by Law (as hereinafter defined), which are separately addressed in Section 8.8);

Amendment to APA, § 3.2.  Schedule 3.2, referenced in this section, identifies needed repairs on

the roofs of several stores and the parking lot asphalt of several others.  And Section 8.8 of the

APA provides:

The Early Parties shall be jointly and severally liable for any and all costs and expenses associated with any and all alterations, improvements, and repairs that any Governmental Authority may require Buyer to make to the Premises in order for Buyer to obtain any and all business licenses and other Permits required by Law to be obtained by Buyer to unconditionally commence the operation of the Business at and from the Premises as it has been operated by Seller at and from the Premises prior to Closing.  Buyer shall deliver to Seller (a) a copy of any inspection report or other document or instrument prepared by any Governmental Authority (a "Report") that sets forth the noncomplying conditions or deficiencies that shall have to be satisfactorily addressed in order for Buyer to obtain any license or other Permit and (b) an "Estimate" of (i) the costs and expenses (collectively "Costs") associated with any and all alterations, improvements and repairs (collectively "Repairs") that Buyer shall be required to make to the Premises in order to obtain any such license or other Permit and (ii) the period of time that shall be required to make the Repairs. Within 10 days following the Early Parties' receipt of a Report and an Estimate in accordance with Section 10.4, Buyer and D.W. Early shall agree on the amount of the Costs, the deadline by which the Repairs shall be completed (the "Repairs Deadline") and the contractor or contractors that shall perform the Repairs.  If the Repairs shall not be completed to the satisfaction of the applicable Governmental Authority by the Repairs Deadline because of any act or failure to act or other fault on the part of any of the Early Parties or any Affiliate of any of the Early Parties, including but not limited to Holdings, then Buyer may cause the Repairs to be completed as promptly as possible to the satisfaction of the

> applicable Governmental Authority, and the Early Parties shall pay,
> or shall reimburse Buyer for any and all costs associated with the
> Repairs.  Buyer's right to reimbursement under this Section 8.8
> shall be subject to Buyer's offset rights under Section 9.5.

APA § 8.8.

While the APA also contains a provision regarding the payment of environmental corrections, the issue of repairs to make the stores ADA compliant is never specifically addressed.  The issue, therefore, becomes whether the alleged oral agreements with respect to repairs supplement or contradict the APA.

As to repairs known and unknown, the alleged oral agreement specifically contradicts the APA.  Section 3.2 provides that $283,676 shall be offset against the purchase price for repairs to buildings, parking lots and other improvements located on the Premises, *including but not limited to* the repairs set forth on Schedule 3.2.  BFS's argument that there was an agreement with the Early Parties that they would pay amounts in addition to the $283,676 with respect to other unknown repairs not listed in Schedule 3.2 is directly at odds with the contractual language.  Evidence of prior or contemporaneous agreements or discussions is not admissible to contradict terms of the written agreement.

As to the alleged oral agreement with respect to the ADA repairs, Section 8.8 provides broad language regarding "any" improvements and repairs required by "any" governmental authority.  The Early Parties contend that the ADA repairs fall under Section 8.8 and BFS failed to follow the dictates of Section 8.8.  BFS contends that the parties agreed to deal with the ADA separately and to the extent that ADA repairs may be considered to be covered by Section 8.8, it provided the Early Parties with notice of the governmental requirements by providing the Early Parties with a copy of the ADA Consent Decree during the negotiations on the APA.

13

Again, the court finds BFS's argument that there was an oral agreement to deal with the APA outside of the framework provided by the APA to be contrary to the express terms of the APA.  The parties negotiated the terms of the agreement and agreed to "any" improvements and repairs required by "any" governmental authority.

In support of its argument that an oral agreement was reached, BFS relies on the testimony of its principal negotiator, Capretta.  But unilateral expectations and understandings do not create an enforceable agreement.  *See Prince Yeates & Geldzahler v. Young*, 2004 UT 26, ¶16, 93 P.3d 179, 184.  Even in the context of an oral agreement, there must be a meeting of the minds with sufficient definiteness to be enforced.  *Id.*  BFS has not demonstrated that there was a meeting of the minds with respect to the alleged oral agreements.

Even if Capretta's testimony actually did provide support for the existence of oral agreements as characterized by BFS, the alleged agreements would be void and unenforceable.  The agreement was essentially that BFS would perform all of the repairs and the parties would negotiate and agree later as to which party was responsible to pay for each specific repair.  An agreement to agree at a later date is unenforceable as a matter of law.  *See Prince Yeates*, 2004 UT at ¶17, 94 P.3d at 184.  "So long as there is any uncertainty or indefiniteness, or future negotiations or considerations to be had between the parties, there is not a completed contract.  In fact, there is no contract at all."  *Id.*; *see also Harmon v. Greenwood*, 596 P.2d 636, 639 (Utah 1979) ("Such agreements to agree are generally unenforceable because they leave open material terms for future consideration, and the courts cannot create these terms for the parties.").

BFS further argues that there is evidence of ongoing discussions separate from the APA based on the APA Amendment which the parties began negotiating shortly after the execution of

the APA.  In the amendment, the parties "reshaped the deal" by dropping the Heber store from

the APA and lease agreements.  BFS argues that this proves that the agreements were in flux and,

therefore, not fully integrated.  The APA Amendment, however, is a written amendment

executed consistent with the APA's provision that all amendments must be in writing.  The

execution of a written amendment in compliance with the parties' written agreement does not

support a finding that there were separate oral agreements made as well.

The court concludes that the APA, as amended, establishes the parameters of the parties'

agreement with respect to repairs and improvements made on the David Early facilities after BFS

took occupancy.  BFS does not assert that a specific provision of the APA is ambiguous such that

parol evidence is admissible to explain its meaning.  Under Section 3.2 of the APA, the Early

Parties paid a predetermined liquidated amount of $283,676 and otherwise could not be called

upon to pay for repairs or improvements to the facilities unless other express provisions of the

APA applied.  With the exception of the environmental items that the Early Parties do not

contest, Section 8.8 of the APA is the sole potential basis in the parties written agreements for

BFS to assert a right to seek reimbursement.  Section 8.8 provides for  reimbursement for repairs

required by a governmental authority in order for BFS to obtain the necessary licenses and

permits to commence the operation of the business as it was operated by the Early Parties prior to

the closing of the APA.

For each repair falling within the scope of Section 8.8, BFS was required to (1) submit to

the Early Parties a written document from a Governmental Authority stating the reason for

requiring the repair; (2) provide the Early Parties with an estimate of the expected costs,

expenses and schedule associated with the repair; and (3) obtain the Early Parties' prior

agreement with respect to cost, scheduling and contractors to perform such repairs.  BFS presented the Early Parties with the ADA Consent Decree, but there is no evidence of notice as to specific repairs that would be required to comply with the Consent Decree nor evidence of the parties reaching an agreement on the cost and scheduling of ADA repairs.

The notice and requirement provisions in the APA constitute conditions precedent to BFS's right to obtain reimbursement from the Early Parties for costs.  *See Edwards & Daniels Architects, Inc. v. Farmers Properties, Inc*., 865 P.2d 1382, 1386 (Utah Ct. App. 1993).  BFS contends that the Early Parties waived those conditions by their oral agreements, their course of conduct after the APA was executed, and by their failure to object when they learned about the work that was being completed at the stores.  The court has already determined that there is no evidence of valid or enforceable oral agreements.

In addition, the facts do not demonstrate that the Early Parties intended to relinquish a known right.  The mere knowledge that work was being done on the stores does not equate to knowledge that BFS was expecting the Early Parties to pay for that work.  Hoffman's alleged request that BFS send him any Section 8.8 items that they had does not demonstrate that the Early Parties intended to waive the requirements of Section 8.8.  If anything, it shows that the Early Parties intended to operate under those provisions.  Because BFS did not comply with the notice requirements of Section 8.8, it would have been impossible for the Early Parties to know for which of the $5,000,000 in repairs and improvements BFS would be seeking reimbursement.  Because BFS undisputedly failed to fulfill these prior conditions, the Early Parties are not obligated to pay those costs.

Because the court concludes that the provisions of the APA govern the parties dealings,

16

the court further finds that BFS has wrongly withheld $208,300 in lease payments, $500,000 in non-compete payments, and $126,803 from the Indemnification Reserve based on its asserted right to offset them against the $1,026,498 in repair and improvement costs it sought from the Early Parties.  Such withholdings constitute material breaches of the APA, Lease Agreement, and the Non-Compete Agreements.  Accordingly, the court concludes that the Early Parties are entitled to summary judgment on their declaratory judgment and breach of contract causes of action.

## B.  BFS's Counterclaims

### 1.  Covenant of Good Faith and Fair Dealing

BFS contends that the rights and duties agreed upon by the parties were part of the APA, part of an oral agreement between Capretta and Hoffman, or established in the parties' course of conduct.  BFS, however, has not brought any claim against the Early Parties for breach of contract.  Instead, BFS's claim for breach of the covenant of good faith and fair dealing attempts to change the parties' obligations from those outlined in the APA.  The covenant of good faith and fair dealing cannot "establish new, independent rights or duties not agreed upon by the parties."  *Brehany v. Nordtrom, Inc.*, 812 P.2d 49, 55 (Utah 1991).  "The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract."  *Peterson v. Browning*, 832 P.2d 1280, 1284 (Utah 1992).

In this case, the Early Parties fulfilled their duties under the APA.  The implied covenant of good faith and fair dealing cannot change express provisions in a contract.  Therefore, the court grants the Early Parties' motion for summary judgment on BFS's claim for breach of the covenant of good faith and fair dealing.

### 2. Unjust Enrichment & Promissory Estoppel

The Early Parties argue that BFS cannot bring claims for unjust enrichment and promissory estoppel when the relationship between the parties is fully governed by integrated written contracts.  To the extent that BFS alleges it has been harmed by the Early Parties' conduct, its legal remedy is based on the contracts themselves and it cannot pursue equitable claims for unjust enrichment or promissory estoppel.  *See American Towers Owners Assoc., Inc. v. CCI Mechanical, Inc.*, 930 P.2d 1182, 1193 (Utah 1996) ("The doctrine [of unjust enrichment] is designed to provide an equitable remedy where one does not exist at law.  In other words, if a legal remedy is available, such as breach of an express contract, the law will not imply the equitable remedy of unjust enrichment.")  Accordingly, the court grants the Early Parties' motion for summary judgment on these claims.

### 3. Waiver

BFS alleges a counterclaim seeking a declaratory judgment that the Early Parties "waived their right to object to the repairs and environmental cleanup performed on the Leased Premises when they did not object to the work."  The Early Parties do not contest BFS's "Environmental Requirements" charges of $84,197.  With respect to the remaining charges, the Early Parties objected to the work at the time that they received BFS's October 25, 2005 demand for reimbursement.  As discussed above with respect to the Early Parties' claims, BFS did not provide the Early Parties with notice of the repairs and improvements it intended to make pursuant to the APA, therefore, the Early Parties could not have waived their rights to object. There is no evidence that prior to the completion of the work the Early Parties knew of the specific repairs and improvements and their obligation to make payments under the provisions of

18

the APA.  Accordingly, the court grants the Early Parties' motion for summary judgment on BFS's waiver claim.

### 5.  Negligent Misrepresentation

BFS has brought a counterclaim against the Early Parties based on representations allegedly made by Jeremy Hoffman, the Early Parties' counsel, during the negotiations and execution of the APA and related agreements.  The Early Parties argue that there can be no claim because there was no duty between Jeremy Hoffman and BFS.

The Utah Supreme Court has held that "a duty to disclose is a necessary element of the tort of negligent misrepresentation." *Smith v. Frandsen*, 2004 UT 55, ¶11, 94 P.3d 919, 923. "Without a duty, there can be no negligence as a matter of law, and summary judgment is appropriate." *Id*. at ¶12.

Hoffman was counsel for the Early Parties who were directly adverse to BFS in the negotiation, execution, and performance of the APA and related written agreements.  BFS cites no legal authority for the proposition that Hoffman had a "duty to make accurate representations to BFS" in connection with the negotiations of the APA and other agreements.  While Hoffman had a duty not to make fraudulent misrepresentations, Hoffman did not owe BFS the same standard of care and duties of disclosure that he owed his own clients.  BFS's main negotiator, Capretta, testified that Hoffman did not misrepresent anything to him during the negotiations.  Without the necessary relationship between Hoffman and BFS, there is no duty and the claim fails as a matter of law.

**BFS's Motion for Partial Summary Judgment**

BFS argues that the Early Parties are estopped from denying reimbursement.  The first part of this argument relates to environmental reimbursement and the Early Parties have agreed to reimbursement for those costs.  Accordingly, the court finds the portion relating to environmental reimbursement costs to be moot.

The court finds no legal or factual basis for BFS's other claims for estoppel.   The parties' relationship is governed by the written agreements.  BFS is entitled to reimbursement for the repairs that fall within the scope of an APA provision that requires the Early Parties to reimburse it.  BFS, however, was required to comply with the express preconditions to reimbursement set forth in the APA.  "If the parties intended [to create the alleged duty or right], the parties could have clearly drafted the contract to manifest that intent. [The court] will not make a better contract for the parties than they have made for themselves." *Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 19, 52 P.3d 1179, 1185.

Moreover, as a sophisticated party to a detailed and heavily negotiated series of written agreements, BFS is charged with knowledge of the duties and requirements set forth in that agreement.  *Inland Bulk Transfer Co. v. Cummings Engine Co*., 332 F.3d 1007, 1016 (6th Cir. 2003) ("The parties are 'chargeable with the knowledge of the terms contained in the contract.'" ).  A party "claiming an estoppel cannot rely on representations or acts if they are contrary to his knowledge of the truth or if he had the means by which with reasonable diligence he could ascertain the truth." *See Youngblood*, 2007 UT 28 at ¶33; 158 P.3d at 1097.  Accordingly, BFS's motion for partial summary judgment is denied.

**CONCLUSION**

For the reasons stated above, the Early Parties' Motion for Summary Judgment is

GRANTED, and BFS's Motion for Partial Summary Judgment is DENIED.

DATED this 25th day of January, 2008.

BY THE COURT:

Dale A. Kimball,
United States District Judge